IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 91-504-3 (EGS)

ZAYD HASSAN ABD AL-LATIF MASUD
    AL SAFARINI,
    Movant,

    v.                                                    EMERGENCY MOTION

UNITED STATES OF AMERICA,
    Respondent.

MOVANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C.
§3582(c)(1)(A), THE AMENDED FIRST STEP ACT OF 2018
AND U.S.S.G. AMENDMENTS EFFECTIVE NOVEMBER 1, 2023

COMES NOW, Movant Zayd Hassan Abd Al-Latif Masud Al Safarini, "Safarini"

appearing pro se respectfully moves this Honorable Court pursuant to 18 U.S.C.

§3582(c)(1)(A), the Amended First Step Act of 2018 and United States Sentencing

Guideline amendments effective November 1, 2023 to modify his sentence and

immediately release him. The unprecedented threat of COVID-19 could not have

been foreseen at Sentencing, and **continues** to pose extraordinary risk to

Safarini's health. The viruses (RSV, COVID-19, and the **novel variants for which

there is no current vaccine**) thrive in densely packed populations, and USP

Terre Haute is ill-equipped to contain the Pandemic and prevent COVID-19 from

becoming a **de facto death sentence** for Safarini. COVID-19 remains a profound

and dangerous threat to incarcerated persons. USP McCreary and USP Allenwood

instituted COVID-19 lockdowns in July 2023 demonstrating that the Federal Bureau

of Prisons is still woefully unable to protect vulnerable inmates from the

ongoing Pandemic.

Mr. Safarini's <u>environment alone</u> makes him especially vulnerable to

catching the deadly virus again and again. Allowing Mr. Safarini to finish out his sentence at home (with a tracking monitor) is the only prudent response to the Extraordinary and Compelling circumstances created by the novel variants.

## EXTRAORDINARY AND COMPELLING REASONS WARRANT A
## REDUCTION IN SAFARINI'S SENTENCE

### COVID-19 continues to be a Public Disaster
### that threatens vulnerable incarcerated persons like Safarini

Mr. Safarini's conditions of confinement create an Ideal Environment for the transmission of the Highly Contagious disease like the Novel Variants for which there is no current vaccine. Because inmates live in close quarters, there is an extraordinary high risk of accelerated transmission of COVID-19 within jails and prisons like USP Terre Haute. Inmates share small cells, eat together and they use the same bathrooms and sinks. They are never given enough tissue or sufficient higiene products. Experts believe that Social Distancing continues to be the number one means in which to stop the spread of the virus; well, that is virtually impossible for Mr. Safarini. In Mr. Safarini's environment, it is not a matterof if he contracts the virus, but rather when he contracts it, even in light of being vaccinated. As recent CDC data shows, vaccine effectiveness rapidly wanes leaving recipients unprotected. See, Tenaforde, et al., "Early Estimates of Bivalent mRNA VAccine Effectiveness...," Morbidity and Mortality Weekly Report (Dec. 16, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm715152e1.htm?s_cid= mm715152e1_w.

## FACTS

### The Former BOP Director Gets Senatorial Kick in the Pants on His Way Out the Door.

The new director of the Federal Bureau of Prisons Colette Peters made it clear

that her to-do list is to stop the widespread drug abuse, <u>substandard health care</u>,

violence and <u>horrific sanitary conditions.</u>

Forbes reported that Peters will take over an agency in disarray:

> "Relations between management and labor is at an all-time
> low, the agency is failing at implementing the First Step
> Act and COVID-19 continues to ravage its institutions. A
> recent survey by Partnership for Public Services, which
> ranks best places to work within the U.S. Government,
> ranked the BOP near last among 432 federal agencies. It
> ranked the BOP dead last in the Effective Leadership
> category. This comes at a time when the BOP is trying
> to recruit new workers to make up for many verean BOP
> employees who are leaving the agency."

> The Atlanta Voice stated, "Senator Ossoff grills Federal
> prison officials over deplorable conditions at Atlanta
> Penitentiary." (July 28, 2022)

> The New York Times stated, "Prison Personnel Describe
> Horrific Conditions, and Cover-Up, at Atlanta Prison."
> (July 26, 2022)

> Forbes stated, "Outgoing Federal Bureau of Prisons
> Director Carvajal Subpoenaed By Senate Subcommittee."
> (July 19, 2022)

### COVID MAY BE AT THE TOP OF
### DIRECTOR PETERS' TO-DO LIST

Incoming Director Colette Peters will not have much of a honeymoon as

director. At July's hearings, Sen. Ossoff said that with Carvajal departing, and

a new director coming in, change at the Bureau of Prisons needs to happen

immediately.

With a fall COVID surge anticipated, Peters might want to look first at the BOP's COVID management. During July's subcommittee hearing, Sen. Alex Padilla (D-CA) said his office has received reports that FCI Mendota had not been following COVID-19 protocols, leading to frequent outbreaks at the facility.

Padilla and Sen. Dianne Feinstein (D-CA) sent the Dept. of Justice a letter in April asking about the lack of COVID-19 precautions but have never received an adequate response. In response to Carvajal's assurance that the BOP "takes these allegations seriously," Padilla said, "We communicated to you months ago that we understand they aren't being followed."

Fourteen other senators in July demanded that the BOP explain its scant use of COVID theraputics, based on reports that the BOP used just a fraction of the COVID-19 drugs allotted by the federal government. It urges Bureau leadership to revamp its approach toward COVID-19 testing to catch more infections that could benefit from these drugs (which need to be given early in a person's illness).

"The experience of the pandemic for the federally incarcerated population remains starkly worse than for non-incarcerated individuals," the letter said. "This discrepancy can only be addressed through affirmative, comprehensive changes from the Bureau of Prisons to improve th availability of COVID-19 vaccines, testing, and theraputics."

The Dept. of Health and Human Services has reported that BOP consistently declines additional COVID-19 drugs. "We have reached out multiple times to BOP asking them why they do not want their allocations offered by HHS. They consistently say they have enough to meet demand/their demand is low," DHHS wrote in a May 4 email to Congress. A more recent letter demands information from the

BOP by Sep. 9, including data on the turnaround time for COVID-19 tests and the policies governing when incarcerated people are tested.

Recently, the BOP reported 471 inmates and 476 staff with COVID, with COVID present in 112 facilities (the most since Mar. 2). The total number of COVID tests performed on inmates fluctuates inexplicably but suggests no testing being done since Jan. 25. Peters might want to start requiring BOP COVID stats to be meaningful.

## THE GOVERNMENT WILL CLAIM BECAUSE SAFARINI IS VACCINATED HE IS SAFE FROM HARM FROM THE VIRUS

Mr. Safarini is housed in a United States Penitentiary (USP) which is a Super Spreading environment. The virus thrives in densely packed populations, and USP Terre Haute is ill-equipped to cotain the pandemic and prevent the **novel variants** from becoming a defacto death sentence for Mr. Safarini.

The Government will claim that Mr. Safarini has fully recovered after contracting the virus. That is just not true. Mr. Safarini continues to suffer with **LONG COVID** symptoms, as is the case with most inmates who have contracted the virus. In his environment, he is likely to catch COVID-19 over and over again. USP Terre Haute is not testing inmates at this time. So their claims of having NO positive cases of COVID is just not the truth. There are sick inmates walking around Mr. Safarini's housing unit who are not being tested for COVID-19. So, the BOP claims of zero positive cases is deceiving at best.

## COVID-19 is not over, experts say, "Brace for outbreaks in the near future."

If the President and Vice President can contract the virus in the most

protected house in America, then how safe are the incarcerated Americans in a
United States Penitentiary? Certainly if the President, who was fully vaccinated
(including boosters), can catch the virus repeatedly, even while fully vaccinated,
how safe are those incarcerated Americans from reinfections in a USP environment
As long as the BOP is not testing they can always deceive Americans about having
a zero positive COVID-19 case count. Again, the Government's assertion there are
682 current inmates who previously tested positive and have recovered is not
factual. Many of those inmates have been reinfected since their first infection,
including Mr. Safarini, and many suffer with LONG COVID symptoms.

USP Terre Haute has done poorly with preventing the spread of COVID-19. See,
**Pressley, et al. v. United States**, 2:21-CV-00202-JMS-MG (S.D. Ind. 2021), an
active Class Action lawsuit against USP Terre Haute due to the deliberate
indifferance and reckless negligence of staff members which resulted in hundreds
of COVID-19 infections and one death. USP Terre Haute continues to refuse to
provide its inmate population with adequate masks (N95) and has refused to allow
its inmate population to purchase the N95 mask. Additionally, USP Terre Haute
medical staff have disclosed to inmates that the COVID-19 boosters they are
giving are outdated and are ineffective against the latest **novel variants.**
Scientists now believe that previous vaccines may be the cause of chronic illness
including heart problems and respiratory problems, now considered LONG COVID.

THIS COURT HAS AUTHORITY TO REDUCE MR. SAFARINI'S
SENTENCE UNDER 18 U.S.C. §3582(c)(1)(A)(i)

The First Step Act was signed in to Law on December 21, 2018. Among the law's

changes, Congress amended the Compassionate Release provision, 18 U.S.C. §3582(c)(1)(A)(i), to "increas[e] the use and transparency of compassionate release." First Step Act 2018 §603(b), Pub. L. 115-391, 131 Stat. 5194, 5239 (Dec. 21, 2018). The Act provides the Sentencing Judge with jurisdiction to consider a defense motion for reduction of sentence based on Extraodinary and Compelling reasons whenever the "defendant has fully exhausted all administrativ rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," **or** after "the lapse of **30 days** from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. §3582(c)(1)(A).

1. The Act provides in pertinent part

(1) in any case --

(A) **the Court,** upon...motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment...**after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that --

(i) extraordinary and compelling reasons warrant such a reduction...

Preliminary, this motion is properly before this Court because Mr. Safarini has satisfied §3582(c)(1)(A)'s 30 days lapse provision. Mr. Safarini submitted a request for reduction in sentence to the warden of his facility more than 30 days

ago.

Section 3582(c)(1)(A)(i) authorizes the modification of a sentence of imprisonment if "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," as set out in the United States Sentencing Guideline §1B1.13. This Court has discretion to reduce the term of imprisonment imposed in this case based on §3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after consideration of the factors set forth in Section 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction." Pursuant to the requirement of 28 U.S.C. §994(t), as authorized by 28 U.S.C. §994(a)(2)(C), the Sentencing Commission promulgated a plicy statement that sets out the criteria for a reduction in sentence, which, as set forth in U.S.S.G. §1B1.13 includes, in relevant part:

> (1)(A) extraordinary and compelling reasons warrant the reduction;
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g); and
>
> (3) the reduction is consistent with this policy statement.

Application Note 1(B) provides the following circumstances that qualifies as extraordinary and compelling reasons: The defendant (i) is at least 65 years old: (ii) is experiencing a serious deterioration in physical or mental health because of the aging process and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."

Hence, it is appropriate for Mr. Safarini to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment -- not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

Note: According to the Center for Disease Control and Prevention (CDC), COVID-19 is a new disease and there is limited infromation regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have severe underlying medical conditions might be at higher risk for severe illness from COVID-19.

   a.   Based on what we know now, those at high risk for severe illness from COVID-19 are:
        • People 60 years and older
        • People who live in nursing homes or long-term care facilities

   b.   People of all ages with underlying medical conditions, particularly if not well controlled, including:
        • People with chronic lung disease or moderate to severe asthma
        • People who have serious heart conditions
        • Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of coricosteroids and other immune weakening medications
        • People with severe obesity (body mass index [BMI] of 40 or higher)
        • People with diabetes
        • People with chronic kidney disease  undergoing dialysis
        • People with liver disease

are the hallmark of those who are most endangered by the instant Pandemic. These are "extraordinary and compelling reasons" for his release.

###### MR. SAFARINI'S VULNERABILITY TO COVID-19 DUE TO HIS HIGH MEDICAL RISK IS AN EXTRAORDINARY AND COMPELLING REASON THAT WARRANTS A SENTENCE REDUCTION

Mr. Safarini suffers with multiple health issues that make him a High Risk

of severe illness or death should he continue to contract COVID-19 or the **novel variants.**

The Defendant suffers from Diabetes, Hypertension/High Blood Pressure, Obesity, and Mental Health issues, to name a few. All of these are recognized by the CDC as risk factors for COVID-19 and the **novel variants.** Obesity is medically recognized as a comorbidity, as the Defendant weights 260 pounds and stands 5'10" tall making his BMI 37 which meets the CDC standard for obesity. The CDC further recognizes that persons with weakned immune systems are at increased risk of Long COVID and other COVID-related conditions of a sever nature and/or death.

The Defendant also suffers from a constellation of other medical conditions like PTSD which can be particularly troublesome and when combined with obesity, diabetes and hypertension may increase his risk of severe illness should he contract COVID-19 again. See, **https://www.cdc.gov/coronavirus/2019_ncov/need-extra-precautions/people-with-medical-conditions.** Additionally, new data from the CDC indicates the new **novel variants** are more infectious and have increased transmissability when compared with other variants, even in vaccinated individuals. See, **https://www.cdc.gov/coronavirus/2019_ncov/variants/delta-variants.** The fact that vaccines are not completely effective and can still allow "breakthrough infections" and experience severe illness has been recognized by several courts, see **United States v. Miranda Sunrez,** 3:01-CR-139-RP (S.D. Iowa July 20, 2021) ECF No. 537 at *4(Defendant's risk of a breakthrough infection and serious illness or death cannot be discounted despite being fully vaccinated. Vaccination is no way to guarantee that a person cannot contract the disease.) The District of Maryland granted, in part the Compassionate Release/

Reduction in Sentence motion filed by Michael Johnson, see **United States v. Johnson**, 2021 U.S. Dist. LEXIS 225920 (D. Maryland)(holding that the defendant's vaccination status does not negate that his underlying health conditions make him eligible for compassionate release). Indeed, recent developments make it clear that the pandemic is continually evolving and ongoing.

<u>Hypertension.</u>

Mr. Safarini's hypertension, which is a core risk factor for COVID-19 and the **novel variants**, places him in particular danger should he contract the virus again. While our understanding of COVID-19 and **its variants** is rapidly evolving, it is becoming increasingly apparent that cardiovascular symptoms are a major risk factor for anybody who is diagnosed with COVID-19 or **its variants**. Several courts have granted relief based on this condition, in conjunction with other risk factors, such as obesity and/or hypertension. See, **United States v. Johnson**, No. 03-20013-01-JWL, 2020 U.S. Dist. LEXIS 187755, at 5-6 (D. Kan. Oct. 9, 2020).

> The CDC indicates that persons with obesity and Type 2 Diabetes are at increased risk, and those with hypertension might be at increased risk for severe illness from COVID-19.

<u>Obesity.</u>

Here because Mr. Safarini has a chronic disease the CDC has identified as a risk factor for COVID-19, specifically obesity, then the Government should agree that he has met the extraordinary and compelling prong.

A.  Safarini's Obesity During COVID-19 Presents "Extraordinary
and Compelling Reasons" that Justify Compassionate Release.

On March 11, 2020, the World Health Organization (WHO) officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a Pandemic.[1] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§1601 et seq.[2] Several days later, the Whiete House issued guidance recommending that gatherings of ten or more persons be canceled or postponed.[3]

The Department of Justice has taken the position in litigation that, under present circumstances, an inmate's diagnosis with a medical condition that the CDC has identified as a risk factor for COVID-19, and from which the inmate is not expected to recover, presents an "extraordinary and compelling reason" that may warrant compassionate release if other criteria are also met. **United States v. Davis**, 3:13-CR-00045-RLY-CMM (Dkt. 84 p. 6-7), **United States v. Garcia**, Gov't Unopposed Motion for Remand, June 8, 2020, 7th Cir. Ct. App., Case No. 20-1716, p. 7-8, available at *3 (E.D. Pa. May 4, 2020)(noting and agreeing with Government's position)." Here, because Safarini has a chronic disease that the CDC has identified as a risk factor for COVID-19, specifically obesity, then the Government should agree that he has met the extraordinary and compelling prong.

---

[1] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at **https://bit.ly/2W8dwpS**.

[2] The White House, Proclamation on Declaring A National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020) available at **https://www.whitehouse.gov/ presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/**.

[3] Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," New York Times (March 17, 2020), available at **https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-house.html?action=click&module=Spotlight&pgtype=Homepage**.

If the Government does not agree or this Court is not inclined to adopt the DOJ's interpretation of extraordinary and compelling, then it should turn to what other courts have done and turn to the United States Sentencing Commission's policy statement for the BOP on compassionate release, adopted before the passage of the First Step Act. U.S.S.G. §1B1.13 and its accompanying Application Notes. Although §1B1.13 predates the First Step Act, a majority of courts have concluded that §1B1.13 provides helpful, if not dispositive guidance for understanding the breadth of discretionary authority afforded courts in these cases. See, e.g., **United States v. Schmitt,** 2020 WL 96904, at *3 (N.D. Iowa, Jan. 8, 2020); see, e.g., **United States v. Rodriguez,** 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); **United States v. Urkevich,** 2018 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); **United States v. Brown,** 411 F. Supp. Ed 466, 451 (S.D. Iowa 2019); **United States v. Fox,** 2019 WL 3046086, at *3 (D. Me. July 11, 2019); **United States v. Beck,** 2019 WL 2716506, at *6 (M.N.C. June 28, 2019); **United States v. Cantu,** 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). U.S.S.G. §1B1.13 states that compassionate release requred "extraordinary and compelling reasons" consideration of the factors set forth in §3553(a); and that the petitioner "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." U.S.S.G. §1B1.13.

The Application Notes in §1B1.13 provide four categories under which extraordinary and compelling circumstances might exist. Those categories are: (A) Medical Condition of the Defendant; (B) Age of the Defendant; (C) Family Circumstances; and (D) Other Reasons. The first three categories outline specific criteria that would need to be met, while the fourth, "Other Reasons," provides

an open-ended catch-all, allowing a court to use its discretion to assess whether "there exists in the defendant's case an extraordinary and compelling reason other than...the reasons described in subdivisions (A) through (C)." U.S.S.G. §1B1.13, cmt. n.1.  This provision supports courts' conclusdions that those charged with evaluating a compassionate release petition have broad discretion to do so.

Defendant suffers from a number of medical conditions that increase his risk of sever illness from COVID-19. As courts have recognized, persons with such co-morbidities are at even greater risk. See, e.g., **United States v. Beam,** No. 4:17-CR-00463-MHH-GMB-1, 2020 U.S. Dist. LEXIS 233265, at *19-20 (N.D. Ala. Dec. 11, 2020)(obesity, diabetes, and hypertension); **United States v. Hayes,** No. 09-CR-1032, 2020 U.S. Dist. LEXIS 118325 at *6 (N.D. Ill. July 7, 2020)(diabetes, hypertension, and obesity); **United States v. Smith,** No. 15-CR-30039, 2020 U.S. Dist. LEXIS 98878, at *13-14 (C.D. Ill. June 5, 2020)(obesity, hypertension, diabetes, and sleep apnea).

Furthermore,

With a BMI above 30, Mr. Safarini is obese. See, **https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.**

According to guidance from the Department of Justice, the government concedes that a body mass index (BMI) over 30 constitutes an extraordinary and compelling reason warranting reduction in sentence. See, **United States v. Steven Cole,** No. 1:18-CR-167, Doc. 95 (D. Md. July 30, 2020)(government letter to court outlining guidance received from the Justice Department). The Department made it clear that it continues to follow the CDC's guidance in determining whether an

"extraordinary and compelling reason" exists. And according to the guidance, "[h]aving obesity, defined as a body mass index (BMI) of 30 or above, increases your risk of severe illness from COVID-19." See, https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity.

A court recently granted compassionate release to a 24-year old where the **only** medical condition identified was obesity (BMI between 31 and 32), see, **United States v. Mitchell,** No. 17-CR-20652, Doc. 76 (E.D. Mich. July 27, 2020).

In **Mitchell,** the court pointed to a study illustrating that those younger than 60 are still at risk of developing complications from COVID-19. **Id.** at *7-8 (citing Jennifer Lighter, et al., Obesity in Patients Younger than 60 Years is a Risk Factor for COVID-19 Hospital Admission, Clinical Infectious Diseases (Apr. 9, 2020), https://academic.oup.com/cid/advance-article/doi/10/1093/cid/ciaa415/ 5818333 (last visited July 20, 2020)). That "study found that individuals younger than 60 years old, with a BMI between 30 and 34, were twice as likely to need acute medical care related to COVID-19 than those with a BMI lower than 30. [It also] revealed that individuals under 60 with BMIs between 30 and 34 were 1.8 times more likely to need intensive emergency care than those with BMIs lower than 30." **Id.**

Indeed, an April 2020 study conducted at NYU Lagone Health Center in New York City found that "obesity of patients was the single biggest [chronic] factor, after age, in whether those with COVID-19 had to be admitted to a hospital." **United States v. Delgado,** _____ F. Supp. 3d _____, 2020 WL 2464685, at *3 (D. Conn., 2020)(quoting Tiernan Ray, NYU Scientists -- Largest US Study of COVID-19 Finds Obesity the Single Biggest 'Chronic' Factor in New York City's

Hospitalizations, ZDNet (Apr. 12, 2020), available at **https://www.zdnet.com/
article.nyu-scientists-largest-u-s-study-of-covid-19-finds-obesity-the-single-
biggest-factor-in-new-york-critical-cases/)**). And "the chronic condition with
the strongest association with critical illness was obesity, with a substantially
higher odds ratio than any other cardiovascular or pulmonary disease." **United
States v. Jenkins**, _____ F. Supp. 3d _____, 2020 WL 2466911 (D. Colo. May 8,
2020ǁ(quoting Petrilli et al., Factors associated with hospitalization and
critical illness among 4,103 patients with COVID-19 disease in New York City,
medRxiv (Apr. 11, 2020), **https://www.medrxiv.org/content/10.1101/2020.04.08.
20057794v1.full.pdf+html**)).

Mental Health.

Mr. Safarini is a Mental Health Care Level-2 inmate. His experiences while
incarcerated have only exacerbated his existing mental health issues due to
Post-Traumatic Stress Disorder (PTSD). Mr. Safarini is currently being medicated
daily to treat the severe depression he suffers from due to his PTSD.

The CDC also recognizes that persons who are "immunocompromised", meaning
the state of having "conditions and treatments [that] weaken a person's immune
system," are also susceptible to serious illness or death should they contract
COVID-19. See, **http://www.cdc.gov./coronavirus/2019-ncov/need-extra-precautions
immunocompromised.html**.

Research into the branch of medical science called psychoneuroimmunology,
a/k/a PNI, is outlined below. Despite the intimidating name of this scientific
enterprise, the findings accord with common experience: Persons under stress

(and particularly persons suffering from serious mental health challenges like depression, schizophrnic disorders, anxiety, and antisocial personality disorder) often develop compromised immune systems. See, e.g., **https://en.wikipedia.org/ wiki/Psychoneuroimmunology#Psychoneuroimmunological_effects**. At least one court has recognized that mental health disorders and illnesses are relevant for purposes of determining a petitioner's health. See, **United States v. Dillard**, No. 1:15-CR-00170-SAB (D. Idaho Apr. 27, 2020)(noting petitioner's schizophrenia as a reason to grant compassionate release). Therefore, based on his PTSD and depression, Mr. Safarini is thus susceptible to serious illness or death if he contracts the virus.

Diabetes.

The Centers for Disease Control and Prevention states "having diabetes increases your risk of severe illness from COVID-19". See, **https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html**. Judges in this district have accordingly followed their counterparts around the country in granting compassionate release to inmates suffering from diabetes, who are unquestionably in danger due to their incarceration during a pandemic. Thus, medical research and overwhelming legal precedent agree -- Mr. Safarini's diabetic condition is a COVID-19 risk factor that by itself suffices as an extraordinary and compelling reason to warrant compassionate release.

Hypertension.

Mr. Safarini currently suffers from hypertention and is prescribed several

blood pressure medications to treat this condition. The CDC notes that individuals with hypertension or high blood pressure might be at an increased risk of severe illness and death from COVID-19. A CDC survey fround that across 14 states, hypertension was the most common underlying condition among patients hospitalized for COVID-19 and was associated with nearly 50% of hospitalizations.

Beyond the CDC, it is likewise widely accepted that hypertension presents a serious risk factor for COVID-19. The National Foundation for Infectious Diseases, for example, cautions that "people with chronic medical conditions including... hypertension are at a higher risk for more serious COVID-19 illness and death." The evidence supports this conclusion. International surveys show that hypertension increases a patient's likelihood of death from COVID-19 by at least 12% for each age group under 70, and by as much as 19% for hospitalized patients under the age of 50. The evidence "indicates that hypertension is consistently associated with severe or critical illness, and with death." The World Health Organization similarly found that in China, hypertension was associated with high fatality rates across all people who contract COVID-19 (8.4%) as compared to the average population, and wrote that individuals with hypertension fall into that group of people "at highest risk for severe illness and death." Closer to home, June data from New York's Department of Health shows that of 24,661 COVID-19 fatalities reported in New York, 13,158 (53%) listed hypertension as a co-morbidity.

Accordingly, courts around the country and most recently within this district recognize hypertension to be a risk factor warranting compassionate release, particularly when in combination with other listed risk factors. Here

and elsewhere, district courts have recognized the abnormal threat created by
COVID-19 to inmates with hypertension and have answered the call to protect the
lives of compromised individuals by commuting their sentences. As one court
stated:

> It is undisputed that hypertension is one of the most common
> comorbidities in people who experience cases of COVID-19...for
> the purpose of evaluating the instant motion, the Court finds
> that [the Defendant] adequately presents extraordinary and
> compelling reasons for compassionate release, because his
> hypertension, combined with the conditions at [the BOP facility],
> creates an increased risk that he will contract the virus and
> experience severe illness as a result.

United States v. Robinson, No. 3:10-CR-261, at 9 (E.D. Va. July 17, 2020)(citing
United States v. Salvagno, No. 5:02-CR-051, 2020 WL 3410601, at *12 (N.D.N.Y.
June 22, 2020)).


## FACTUAL BACKGROUND

On September 5, 1986, Mr. Safarini, along with a group of co-conspirators,
attempted to hijack Pan American Flight 73, en route from Karachi, Pakistan, to
Frankfurt, Germany with approximately 379 passengers and 78 U.S. Citizens on
board. United States v. Safarini, 257 F. Supp. 2d 191, 193 (D.D.C. 2003). Four
men, including Mr. Safarini, seized control of the aircraft while it was on the
tarmac boarding passengers. Id. The pilot, co-pilot and engineer escaped while
the hijackers were taking control of the aircraft, thereby grounding the plane.
Id.

After having seized control, Mr. Safarini instructed flight attendants to
procure the passports of those aboard the plane, specifically to identify

American citizens. Id. He then demanded that a cockpit crew be provided to fly the plane to Cyprus and thereatened to kill passengers one by one to coerce authorities. Id. To emphasize the seriousness of his request, he then held a passenger, Rajesh N. Kumar, a United States national, at gunpoint, shot him in the head, and threw his body fromt he aircraft onto the tarmac. Id. Following Mr. Kumar's murder, radio communications were established bewtween the plane and the control tower, and Mr. Safarini began negotiations on behalf of the hijackers with Pakistani authorities. Id. Later that day, when the auxiliary power unit supplying power to the plane failed,the hijackers herded the passengers and crew members into the center of the aircraft. Id. Mr. Safarini, alongside his co-conspirators, then opened fire on the aircraft's passengers with assault rifles and pistols, and detonated hand grenades into the crowd. Id. Nineteen passengers were killed during the assault, including a second American citizen, Surendra Patel. Id. More than one hundred other passengers were seriously injured. Id.


## PROCEDURAL BACKGROUND

Mr. Safarini was tried jointly with his four co-defendants in Pakistan in 1987 for charges arising from the events described above. **United States v. Safarini**, 257 F. Supp. 2d at 194 (D.D.C. 2003). Each defendant was convicted and sentenced to death, though each sentence was subsequently commuted to a life sentence. Id. Mr. Safarini, however, was released on September 27, 2001, after being imprisoned for approximately 15 years; and the Federal Bureau of Investigation ("FBI") subsequently captured him as he was traveling to Jordan.

On August 29, 1991, a 126-count indictment against Mr. Safarini had been

returned under seal by a grand jury in the United States District Court for the District of Columbia. See generally Indictment, ECF No. 1. On August 28, 2002, following Mr. Safarini's capture by the FBI, a grand jury returned a superseding indictment charging Mr. Safarini and his four co-defendants with ninety-five federal offenses. See generally, Superseding Indictment, ECF No. 26. On December 16, 2003, Mr. Safarini pled guilty to all ninety-five charges pursuant to a plea agreement. See Plea Agreement, ECF no. 118. He was represented by Robert Tucker, Esquire, of the Office of the Federal Public Defender for the District of Columbia, and private counsel, David Bruck, Esquire. See Id. at 1. The counts of of conviction included charged of murder, attempted murder, attempeted air piracy, hostage-taking, and conspiracy to commit offenses against the United States. See Id.

Under the terms of the agreement, the government agreed that it would not seek the death penalty, and the parties agreed that the appropriate sentence was three consecutive life sentences, plus 25 years. See Plea Agreement, ECF No. 118. In addition, pertinent to several of the claims Mr. Safarini now raises, the plea agreement included the following provision:

> Your client also voluntarily and knowingly waives your client's right to challenge the sentence or manner in which it was determined, or the plea itself, in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. Your client understands that, under legal ethical rules, you are not permitted to advixe your client to waive any claims of ineffective assistance of counsel against you and, therefore, this waiver does not include any such claims of ineffective assistance of counsel against you. Plea Agreement, ECF No. 118. This Court accepted the parties' Rull 11(c)(1)(C) plea agreement and sentenced Mr. Safarini to the agreed-upon sentence. See Minute Entry, May 13, 2004. The Court entered the judgment on May 24, 2004. See Judgment, ECF No. 125. Mr. Safarini did not note an appeal. See generally Docket for Criminal Action No. 91-504-3.

Approximately twelve years later, Mr. Safarini began to collaterally attack his convictions. First, on or about June 18, 2016, he mailed to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") two pro se motions: (1) a §2255 motion; and (2) a Motion Under 28 U.S.C. §2244 for Order Authorizing the Disticrt to Consider Second or Successive Application for Relief Under 28 U.S.C. §2255 ("§ 2244 motion"), see Petition, United States Court of Appeals for the District of Columbia ("D.C. Circuit") Docket #16-3094. In his § 2255 motion, Mr. Safarrini asserted that his conviction relating to the §924(c) firearms offense (Count 95) must be vacated in light of the Supreme Courts's decision in **Johnson v. United States**, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). See generally § 2255 Motion, ECF No. 141. On August 5, 2016, the Federal Circuit transferred these motions to the D.C. Circuit. See D.C. Circuit, Docket #16-3094.

On September 19, 2016, the government requested that the D.C. Circuit transfer the two motions to this Court because the § 2255 motion was not "second or successive." See Gov't's Omnibus Opp'n, ECF No. 151 at 5. On October 17, 2016, Mr. Safarini's § 2255 and §2244 motions were transferred to this Court. See Notice, ECF No. 138. On Fedruary 14, 2017, Mr. Safarini filed with this Court a copy of his § 2255 motion that had been previously sent to the Federal Circuit. See § 2255 Motion, ECF No. 141.

While Mr. Safarini's § 2255 and §2244 motions were being filed elsewhere and transferred to this Court, on August 29, 2016, he filed in this Court a pro se Motion to Dismiss Conviction and Indictment Because District Court Lacked Jurisdiction to Try this Case, see ECF No. 136. The Court directed the government to file a response. See Minute Order, January 29, 2017. On February 17, 2017, Mr.

Safarini filed a motion to withdraw his motion to dismiss, asserting that it did not "represent the arguments and case law [he] wish[ed] to argue" and indicating that he planned to file another motion at a later date "to address the true essence of jurisdiction that [he] wish[ed] to argue." Mot. to Dismiss, ECF No. 142. On February 27, 2017, the government filed its Opposition to Mr. Safarini's pro se motion, even though Mr. Safarini had moved to withdraw that motion. See Resp. to Mot., ECF No. 144.

On February 28, 2017, Mr. Safarini filed a revised pro se Motion to Dismiss Counts of the Indictment Under Titles 18 U.S.C. §§ 2331 and 844(i), Titles 49 U.S.C. App. §1472 and 49 U.S.C. §46502 and Void Plea Agreement for Lack of Jurisdiction ("Def.'s Suppl."), see ECF No. 145. The Court subsequently granted Mr. Safarini's motion to withdraw his initial pro se Motion to Dismiss. See Minute Order, April 12, 2017. The Court further ordered the government to respond to Mr. Safarini's § 2255 motion and to his revised February 28, 2017, motion to dismiss. See Id.

On September 12, 2017, the government filed its Omnibus Opposition to Mr. Safarini's pro se motions. See Gov't's Ominbus Opp'n, ECF No. 151. The Court subsequently appointed counsel, Jerry Ray Smith, Esquire, to represent him. See Minute Order, September 21, 2017. On May 21, 2018, Mr. Safarini, through counsel, filed a Reply to the government's Omnibus Opposition. See Reply, ECF No. 159. On September 12, 2018, the government filed its Surreply. See ECF No. 162.

On September 21, 2018, Mr. Safarini's counsel filed a Motion to Stay Post-Conviction Proceedings, pending the receipt of certain medical records, see ECF No. 163; which the Court granted, see Minute Order, October 3, 2018. On

February 11, 2020, Mr. Safarini's counsel filed a Motion to Lift Stay and Set Deadlines for Filing Supplement to Post-Conviction Pleading, see ECF No. 164. On April 13, 2020, Mr. Safarini's counsel filed a Motion for Leave to Expand the Record Under Seal, with attachments, and an accompanying Motion for Leave to File Motion Under Seal, see ECF No. 166.

On April 21, 2020, Mr. Safarini filed pro se: (1) Def.'s Second Suppl., see ECF No. 168; and (2) Def.'s Thrid Suppl., see ECF No. 169. On May 12, 2020, Mr. Safarini's counsel filed a supplement to Mr. Safarini's Motion to Dismiss, see Def.'s Fourth Suppl., ECF No. 170. The government opposed all three filings in an omnibus response. See United States' Opp'n to Def.'s Suppl. and Other Filings ("Gov't's Second Opp'n"), ECF No. 172. Mr. Safarini's counsel filed a reply on September 2, 2020. See Reply ("Second Reply"), ECF No. 173.

**Consequently**, all of Mr. Safarini's post-conviction appeals were denied and his plea of guilt stands.

Mr. Safarini committed the above documented criminal offenses when he was only 25. It is of great significance that Mr. Safarini is asking this Court to re-evaluate his sentence based, in part, on his age at the time of the offenses. Mr. Safarini was only 25 at the time of the offenses, and the **Miller v. Alabama** factors should be considered in assessing Mr. Safarini's request for a reduction of sentence under 18 U.S.C. §3553(a) factors. See, **McCoy**, 981 F.3d 271, 286 (4th Cir. Dec. 2, 2020)(holding the district court was correct to "focus[] on the defendants' relative youth - from 19 to 24 - at the time of their offenses, a factor that many courts have found relevant under §3582(c)(1)(A)(i)."); see also, **McCoy**, 981 F.3d at 283 (referencing **Miller** neurological development, decision-

making, and reform factors in assessing extraordinary and compelling reasons for a defendant arrested at nineteen).

While the categorical ban on mandatory sentences for life without parole for juveniles doesn not apply to Mr. Safarini's age at the time of the crime, research demonstrates that such individuals still experience many of the same behavioral, psychological, and neurological development factors that affect the ability to understand risks and consequences and to make informed, mature decisions. See, e.g., Kathryn L. Modecki, **Addressing Gaps in the Maturity of Judgment Literature: Age Differences and Delinquency,** 32 Law & Hum. Behav. 78, 85 tbl.3 (2007) (describing study finding that college-aged adults statistically shared adolescents' diminished ability to evaluate a situation before acting when compared to older adults). Thus, even without a categorical ban, several courts within the Fourth Circuit have found criminal conduct and arrest at a young age, particularly when accompanied by a minimal prior criminal history and subsequent rehabilitation, favors sentence reduction in most cases. See, **McCoy,** 981 F. 3d at 286 (finding the courts' consideration of the defendants' age of 19 a relevant factor to consider for post-conviction relief analyses), **United States v. Scott,** 2020 U.S. Dist. LEXIS 84313 (D. Md. May 13, 2020)(finding defendant's age of 23 and lack of prior criminal record favored relief); **United States v. Bryant,** 2020 U.S. Dist. LEXIS 75681 (D. Md. Apr. 21, 2020), at *9-10 (noting relative youth -- 24 years old -- and minimal prior criminal record, combined with good post-sentencing conduct greatly favored relief); **United States v. Decator,** 452 F. Supp. 3d at 325-326; **United States v. Maumau,** 2020 U.S. Dist. LEXIS 28392 (D. Utah), at *17.

Restricting **Miller**'s logic solely to individuals under 18 is rooted in an arbitrary legal tradition and ignores the modern science the Supreme Court consulted when developing the **Miller** factors. See, e.g., **United States v. Chavez**, 894 F.3d 593, 609 (4th Cir. 2018)("Contemporary 'society draws the line for many purposes between childhood and adulthood' at 18 years old. [...] It is true of course, that 'the qualities that distinguish juveniles from adults do not disappear when an individual turns 18[.]'" (citing **Roper v. Simmons**, 543 U.S. 551, 574, 125 S. Ct. 1183 (2005))). It should be noted that Mr. Safarini was 25 years old at the time of his offenses. Studies have repeatedly indicated that the prefrontal cortex is not fully developed until age 25. See, e.g., Miriam Arain, et al., **Maturation of the adolescent brain**, 9 Neuropsychiatric Disease and Treatment 449 (2013)(stating, "The fact that brain develpment is not complete until near the age of 25 years refers specifically to the development of the prefrontal cortex."). In **United States v. Streett**, the court found that:

> [T]he prefrontal cortex "helps us control our impulses and
> regulate our emotion," as well as aid in decidion-making,
> reasoning, and planning, such that "we often see risk-taking
> behavior in adolescents because they don't have that complete
> development of the prefrontal cortex."

434 F.Supp.3d 1125, 1161 (D. N.M. 2020)(citing the expert testimony of Sueann Kenney-Noziska, an LCSW, therapist, lecturer on childhood trauma and its impact on neurobilogical development). Thus, **Miller**'s underlying logic -- that juveniles are less culpable for their crimes because, inter alia, their brains are not fully mature in regions related to impulse control, planning, and risk avoidance, **Miller**, 567 U.S. at 472 -- ought to be applied to those individuals who are under 20 years of age. Rather than applying an outdated, arbitrary legal tradition,

**Miller** has set forth that teenagers, including those 18 and 19 years of age, and indeed Mr. Safarini who was 25 at the time of his offenses, meet the same criteria as juveniles with respect to the science of culpability and sentencing.

Mr. Safarini's case comports with the **Miller** factors:

1. Adolescent brains are not fully mature in regions related to impulse control, planning ahead, and risk avoidance;

2. Adolescents cannot extricate themselves from negative family or social environments and are more vulnerable than adults to negative influences such as abuse and neglect;

3. Adolescent brains have an enhanced susceptibility to peer pressure;

4. Adolescents are less able than adults to assist in their defense and properly evaluate plea options; and

5. Because the adolescent brain is not fully formed, adolescents have a tremendous potential for rehabilitation.

**Id.** at 477. See also Scott, Grisso, Levick, and Steinberg, **Juvenile Sentencing Reform in a Constitutional Framework** at § III, 88 Temp. L. Rev. 675, 695-703 (2016)("**Juvenile Sentencing Reform**")(discussing how to apply the five **Miller** factors).

It should be noted that prior to Mr. Safarini's plea-agreement, his pre-trial attornies failed to have him evaluated by psychologists. Had they done so, they would have learned that he had serious mental health issues. A psychological evaluation would have likely changed the outcome of his case and/or sentence. Mr. Safarini's medical records since being in the Federal Bureau of Prisons would indicate that he suffered from **Major Depression** and **Anxiety.** Mr. Safarini spent most of his years of incarceration under torturous conditions, such as, segregation and issolation. This only exacerbated his mental health condition. Mr. Safarini is not only deteriorating mentally, but his health is also quickly

deteriorating.

Mr. Safarini is himself a victim of brain-washing with Islamic Radicalism Ideology. As a 25-year old, with an adolescent brain, not to mention mental health issues, it was easy for these groups to radicalize him, as is the case with many of the youth in Mr. Safarini's country. A 25-year old is just not mature enough to determine the difference between Islam, which is a religion of peace, and Islamic Radicalism Ideology. As a youth, Mr. Safarini was forced to listen to the rhetoric that influenced his decision-making. Mr. Safarini now realizes that all of that rhetoric was not Islam. For Islam is a religion of peace and Muslims are a people of peace. Mr. Safarini now suffers with nightmares in his sleep because of the crimes he committed and the victims in his case. It was through the Life Connections Program "**Victim Impact**" that he was able to understand the impact that his crimes had on the families of the victims. As a result of his crimes, he now suffers with Major Depression, guilt, and shame for the crimes he has committed. He asks that this Court take all of the above into consideration when making a ruling on this Motion.


## DISCIPLINARY HISTORY

Mr. Safarini has **NO** disciplinary history since being incarcerated in the Federal Bureau of Prisons. That says a lot being housed in a United States Penitentiary, where violence is the nature of the environment.


## EXCEPTIONAL PROGRAM HISTORY

### Challenge Program.

Mr. Safarini successfully completed the Challenge Program. The Challenge

Program is a cognitive behavioral, residential treatment program developed for male inmates in the United States Penitentiary ("USP") settings. The Challenge Program provides treatment ot high-security inmates with substance use problems and/or mental illnesses. Programming is delivered within a Modified Therapeutic Community ("MTC"); inmates participate in interactive groups and attend community meetings while living in a housing unit separate from the general population. In addition to treating substance use disorders and mental illnesses, the program addresses criminality, via cognitive behavioral challenges to criminal thinking errors.

The duration of the program varies based on inmate need, but has a minimum requirement of nine months. Mr. Safarini dedicated over nine months and over 500 hours of programming toward his rehabilitative efforts while in the Challenge Program. He successfully completed many courses including, but not limited to, "Rational Thinking", "Criminal Lifestyles", "Violence Prevention", "Reviewing My Drug Use", "Recovery Maintenance", "Lifestyle Balance", "Anger Management", and "Public Speaking".

### Life Connections Program.

Mr. Safarini is a graduate of the Life Connections Program ("LCP"). This program is a Presidential initiative under George W. Bush. The LCP at USP Terre Haute is a **residential**, multi-faith restorative justice program. The mission of LCP is to reduce recidivism and bring reconciliation and healing to victims, offenders and their communities. The LCP's goal is to equip students with the necessary skills, tools and attitudes to successfully reintergrate with their

families, religious communities and civic communities.

The Life Connections Program focuses on the development of secular, reentry-related skills through the student's religious or philosophical perceptions. LCP addresses your whole life. It invites you to learn and practice skills for your physical, mental, emotional and relational health. Learning these skills requires much time and effort. Successful completion of the program requires at least 18 months of full-time programming in the LCP housing unit.

During the Life Connections Program, Mr. Safarini completed over 500 hours of Community Service, 150 hours of Recovery Programming, and release and transitional preparation. Additionally, he completed a multitude of courses including **"Victim Impact"**, "Occupational Re-entry Seminar", "Mock Job Fair" and "Re-entry Simulation".

<u>Non-Residential Drug Abuse Program.</u>

Mr. Safarini has completed drug treatment and drug education courses, including the six-month Non-Residential Drug Abuse Program. The program is a flexible, general population, psychoeducational-therapeutic group designed for treatment of inmates with self-reported substance use disorders. The journalized program is designed to meet the specific individualized treatment needs of the inmates, generally challenging their core beliefs, their most fundamental (negative and unhelpful) ideas about themselves, others, and/or their worlds within the backdrop of their individual substance use. The focus of Non-Residential Drug Abuse Program treatment is to improve an inmates's current functioning as well as to alleviate symptoms that may significantly interfere

with their post-release functioning.

**In closing,** Mr. Safarini asks that this Honorable Court recognize the fact that he was a young and impressionable boy that was brain-washed and influenced by Islamic Radical Ideology, which is the case with most young men in Pakistan and most other countries. Mr. Safarini has come to believe that what he was learning is the opposite of what true Islam is about.

Mr. Safarini is now a 62-year old elderly man who is now suffering with serious medical conditions that is threatened by COVID-19 **new variants.** Mr. Safarini has done everything within his power to prove to this Honorable Court that he is not the 25-year old boy that was sentenced by Pakistan and later sentenced by the United States of America. Mr. Safarini served 15 years in Pakistan and was eventually released. And while on his way back to his homeland, Jordan, he was apprehended and arrested by the Federal Bureau of Investigations. He was extradited back to the United States where he was convicted and sentenced to three consecutive life sentences plus 25 years. Mr. Safarini did not receive fair and adequate legal representation and was cooerced into taking a plea with the threat of death if he declined to take that plea. Mr. Safarini suffered with mental health issues that should have been addressed by the court before taking any plea. Since this time, Mr. Safarini's mental health has greatly deteriorated as well as his physical health. Under the conditions described in this Motion, this Honorable Court should have a hearing on his Motion and appoint counsel to represent him at such a hearing.

## CONCLUSION

For the above reasons, Mr. Safarini prays that this Honorable Court will

grant his Motion for Compassionate Release/Reduction in Sentence pursuant to 18 U.S.C. §3582(c)(1)(A)(i) and the Amended First Step Act of 2018 and in conjunction with the new United States Sentencing Guidelines Amendments of 2023 due to the extraordinary and compelling circumstances raised in this Motion. Mr. Safarini will certainly understand if the Court will consider conditions, such as immediate deportation back to his homeland in Jordan and any other such conditions this Court deems appropriate or appoint counsel and grant his Motion for a hearing.

Submitted this 1st day of November 2023.

Respectfully Submitted,

ZAYD HASSAN ABD AL-LATIF MASUD-
AL SAFARINI
ID#14361-006
USP TERRE HAUTE
P. O. BOX 33
TERRE HAUTE, IN. 47808
CASE NO. 91-504-3 (EGS)





# LIFE CONNECTIONS PROGRAM
# CERTIFICATE OF GRADUATION

This document certifies that

## Zaid Safarini

has successfully completed this eighteen month, faith-based
program at the United States Penitentiary in Terre Haute, Indiana.

## Wednesday, March 29, 2017

Scott P. Bonham, LCP Chaplain

J.E. Krueger, Complex Warden

This certifies that

# ZAID SAFARINI

14361-006

*Has successfully completed the*

## Challenge Program

*(500 hour residential drug treatment program)*

**at USP Terre Haute, IN**

*This certificate is hereby issued this 14th day of November, 2018*

_____
Dr. Davis, Challenge Program Coordinator

_____
Ms. Davis, Challenge Treatment Specialist

_____
Mr. Holmes, Challenge Treatment Specialist

_____
Ms. Payne, Challenge Treatment Specialist

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## MONEY MAKEOVER

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

03/20/2019
_____
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## 7 HABITS OF EFFECTIVE PEOPLE

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

03/20/2019
_____
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

# Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## FINANCIAL PEACE UNIVERSITY

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

03/20/2019
_____
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## LEADERSHIP

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

02/19/2019
_____
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

# Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## ANCIENT EGYPTIAN CIVILIZATION

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

02/19/2019
_____
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## BARBER STYLING

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

_____
02/19/2019
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

# ANGER MANAGEMENT

USP TERRE HAUTE

EDUCATION DEPARTMENT

Staff Signature

7/31/18

Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## GENERATION CHANGE

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

02/19/2019
_____
Date

# FCC TERRE HAUTE

THIS CERTIFIES IS AWARDED TO

## Safarini, Zaid

Completed 12 hours of Adult Continuing Education

## COMMERICAL DRIVERS LICENSE

USP TERRE HAUTE

EDUCATION DEPARTMENT

_____
Staff Signature

6/5/18
_____
Date



**National Fatherhood Initiative®**
www.fatherhood.org



*Certificate of Completion*

This certifies that

## ZAID SAFARINI

has successfully completed the



**Inside DAD®**
**Second Edition**
Program

*Carlos Alcazar*
Chairman of the Board
NATIONAL FATHERHOOD INITIATIVE®

Conducted on     10 Sundays, November 20, 2016 - March 5, 2017

in     the Life Connections Program Unit, USP Terre Haute, Indiana

*Christopher A. Brown*
Executive Vice President
NATIONAL FATHERHOOD INITIATIVE®

Scott P. Bonham, LCP Chaplain_____

Facilitator's Name/Signature

# CERTIFICATE OF PARTICIPATION

*Zaid Safarini*

Attended and actively participated in the Life Connections Program

## Occupational Re-Entry Seminar

## and Mock Job Fair

On January 25-26, 2017 and January 30, 2017

Chaplain Scott P. Bonham, LCP Chaplain

FCC TERRE HAUTE

# Certificate of Completion

### This certifies that

## Zaid Safarini 14361-006

## Has successfully completed the
## Non-Residential Drug Treatment Program

*at the Federal Correctional Complex*
*Terre Haute, Indiana*

*This certificate is hereby issued the 31 day of May, 2018*

Mr. B.Wickware, Drug Treatment Specialist

# Certificate of Completion

## Zaid Safarini

## LCP Shakespeare Discovery:

## As You Like It, Macbeth,

## Romeo and Juliet, (4 - 2 hour classes)

## December 1, 2016

Dr. Allan Bates, Professor

# CERTIFICATE OF COMPLETION

## ZAID SAFARINI

## The Impact of Crime on Victims

*A Victim Impact Component for LCP Graduation (12 hours)*

_Mrs. K. Orr_                                    3/15/2017

**Mrs. K. Orr, Victim Impact Instructor**          **March 15, 2017**

# CERTIFICATE OF PARTICIPATION

**Zaid Safarini**

## PTSD Seminar

Thursday, August 25, 2016, 2 hours

Silouan Green, Veteran Consultant

# CERTIFICATE OF COMPLETION

This certificate is awarded to

## SAFARINI, ZAID

Completed 12 hours of Adult Continuing Education

HEALTH IS EVERYWHERE

USP TERRE HAUTE
EDUCATION DEPARTMENT

_____        2/21/18
Signature                                                                    Date

# CERTIFICATE OF COMPLETION

This certificate is awarded to

## SAFARINI, ZAID

Completed 12 hours of Adult Continuing Education

JOURNALISM

USP TERRE HAUTE
EDUCATION DEPARTMENT

_____   7/20/17
Signature                  Date